UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANUELITA CLEMENTE,

                           Plaintiff,

            -against-                                          07 Civ. 4008 (RJH)

                                                              **MEMORANDUM OPINION
                                                              AND ORDER**

NEW YORK STATE DIVISION OF PAROLE,

                           Defendants.

---

Richard J. Holwell, District Judge:

        Plaintiff brings a Title VII action for employment discrimination against her

employer, the New York State Division of Parole (the "Division").  She alleges that the

Division discriminated against her and subjected her to a hostile work environment on

account of her race and gender, and also in retaliation for a prior Title VII suit she

brought against the Division.  Now before the Court is defendant's motion for summary

judgment.  Because plaintiff has not presented evidence that her race, gender, or the prior

suit—as opposed to her position as a union leader, which Title VII does not protect—

motivated any discriminatory conduct, defendant's motion is GRANTED in its entirety.

                          **BACKGROUND**[1]

        Plaintiff is a parole officer ("PO") and a Hispanic female.  She began working at

the Division in 1994, and during her long career there she has accumulated a number of

---

[1] The facts in this section are drawn from the parties' Rule 56.1 submissions and from the evidence
submitted by the parties if not included in the 56.1 submissions. Unless otherwise indicated, the facts are
not in dispute.  The Division's 56.1 submission is cited as "Def. 56.1" and plaintiff's response submission
is cited as "Pl. 56.1."

commendations, including a Medal of Honor for her role in a high-profile arrest. (Clemente Decl. ¶ 2.)  Since at least 2005, plaintiff has been assigned to the Manhattan Warrant Squad Field Office (the "Warrant Squad"), a unit within the Division that specializes in apprehending delinquent parolees.  (Def 561. ¶ 2; Clemente Dep. at 40:18-20.)

Plaintiff is also a union leader.  On June 23, 2005, she became Council Leader for the Local #236 of the Public Employees Federation, and she led union rallies in Albany on July 8 and July 12, 2005.[2]  (Def. 56.1 ¶ 2.)  Soon thereafter, Clemente asserts that the Division began a course of retaliatory and discriminatory conduct against her that lasted through August 2006.  She contends that this conduct, comprised of four major incidents, permanently damaged her previously stellar professional reputation, scuttled her prospects for advancement in the Division, and caused her anxiety and humiliation. (Clemente Decl. ¶ 9.)

The conduct Clemente complains of began on July 12, 2005, when the Division's director of operations, a Hispanic female named Angela Jimenez, directed her to evaluate the growing problem of absconder parolees in Manhattan and the Bronx.  (Def. 56.1 ¶ 3.) The special assignment required that Clemente assess the causes of the region's high absconder rate, including the correlation between absconders and their individual POs, and recommend a plan to reduce the problem.  (Knudsen Decl. Ex. B at 3.)  Because the assignment entailed evaluation of other POs, plaintiff believes it should have been given to a Bureau Chief, not a PO, and that it conflicted with her duties as Council Leader.  She alleges that Jimenez gave her the assignment "deliberately to compromise [her] position

---

[2] Though the record does not make clear why the union held these rallies, they appear to have concerned the union's belief that it was unduly difficult for POs to obtain arrest warrants for delinquent parolees.  (*See* Karlin Decl. Ex B. at 2.)

as a parole officer and union leader."  (Clemente Decl. ¶ 5.)  Clemente completed the absconder report but had to take two weeks of modified duty, away from her standard responsibilities on the Warrant Squad, to do so.  (*Id*.)

Two months later, after additional union rallies in Albany, the Division's management disseminated a letter ridiculing the union throughout the Division and to the media.  (Def. 56.1 ¶ 5.)  The letter, purportedly written by an anonymous PO, identified and sharply criticized four union leaders.  Of Clemente, it said she "should have been arrested for pulling her gun on a truck driver over a parking dispute a few years ago."  It also accused her of "hiding behind the union," not carrying a full caseload, and making frequent use of the word "ain't."  (Karlan Decl. Ex. B.)  The letter leveled similar insults at the three other leaders it identified.  (*Id.* ("[Sue] Jeffords has been in hot water over her misuse of [union] funds for years.  Other PO's hate her and have refused to work with her."); *id.* ("Mike Murphy . . . is a second-rate PO and shouldn't be on the job either, and no one who has ever worked with Tom Walther (retired) will tell you that he was a 'go to guy' in his day.").)

The Division's director of media relations faxed the letter to a reporter at the Albany Times Union under a cover message reading "I thought you might find this interesting."  (*Id*.)  The Division's deputy director of operations also faxed the letter to the Division's five regional directors with instructions that they share it with their staffs.  (Karlin Ex. C at 201-02.)  The letter was eventually distributed throughout the Division, which Clemente claims destroyed her reputation with union members and management alike.  (Clem. Decl. ¶ 6.)

The third incident occurred in May 2006, when the entire Manhattan Warrant Squad, consisting of at least five individuals, was transferred to the Bronx and consolidated with its counterpart in that borough.  (Def. 56.1 ¶ 8.)  Though defendant asserts that the transfer occurred for office space reasons and because the consolidation made the overall region's Warrant Squad more efficient, Clemente contends that the move "made no sense" and impeded the Manhattan unit's ability to apprehend Manhattan absconders.  (Clemente Decl. ¶ 7.)  In a grievance filed two days after the transfer, Clemente described the move as a "Union-busting technique," and commented "I am sure that this is happening because of my position as a Union Council leader."  (Knudsen Decl. Ex. B at 5.)  Further, she stated, "I am being targeted because I am also the first Hispanic female Council Leader in the history of Parole."  (*Id*.)  Clemente contends that the other POs in the unit blamed her for the transfer.  (Clemente Decl. ¶ 7.)

The fourth and final incident of alleged misconduct occurred at a labor relations meeting on August 25, 2006.  Jose Burgos, director of human resources management, attended on behalf of Division management, and Clemente and other leaders attended for labor.  (Def. 56.1 ¶ 10.)  Burgos and Clemente had a contentious relationship.  Due to prior threats Burgos had made about relocating her, Clemente believed he was responsible for transferring the Warrant Squad to the Bronx.  (Knudsen Decl. Ex. B at 5.)  At the August 25 meeting, the two got into an argument over the appropriateness of removing employees from the field to attend grievance hearings.  (Burgos Aff. ¶¶ 5-6.)  Clemente says Burgos "badgered and embarrassed" her, insulted her intelligence, and called her a "street person."  (Clemente Decl. ¶ 8.)  When Clemente stood to leave, Burgos asked her, "what are you gonna do, what are you gonna do, you're gonna pull out

your gun on me and you're gonna shoot me?"  (*Id.*)  Though the evidence is disputed, according to Clemente and one other witness, Burgos then explained his conduct by remarking, in reference to his own ethnicity, "you know how us Black and Hispanic men are."  (Clemente Decl. ¶ 8; Karlan Decl. Ex. E at 2.)

This is not Clemente's first discrimination suit against the Division.  She commenced a prior action in 2001 premised on allegations of race and gender discrimination related to her work in a different unit, called the Special Offender Unit, between 1999 and 2001.  The allegations in this case do not concern any of the same members of Division management and do not otherwise relate to the allegations in the prior case.  *See Clemente v. New York State Div. of Parole*, No. 01 Civ. 3945 (TPG), 2004 WL 1900330, at *1-7 (S.D.N.Y. Aug. 24, 2004).  The Division won summary judgment in that case in 2004, in part because plaintiff failed to present evidence "that raise[d] an inference of her alleged ill treatment being motivated by her race or sex."  *Id.* at *12.  Plaintiff asserts that the Division's victory in the prior suit "emboldened" it. (Clemente Decl. ¶ 3.)  She alleges that the allegedly wrongful conduct described above came in retaliation for her decision to bring that suit and was also motivated by race and gender animus.  (*Id.* at ¶ 9.)

On May 12, 2006, after the absconder assignment, the transfer, and the anonymous letter, but before the meeting with Burgos, Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").  After receiving a response from the Division, the EEOC dismissed Clemente's claims, concluding that "the issue at stake here appears to be a labor relations dispute, rather than a case of racial

or sexually discriminatory animus." (Def. 56.1 ¶¶ 9, 12.) The agency issued Clemente a right to sue letter, after which she timely initiated this suit.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Federal Rule of Civil Procedure 56(e) states that a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). This requirement has particular value when a party's responsive documents are long on speculation and short on specific facts. "[S]peculation alone is insufficient to defeat a motion for summary judgment." *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir. 2006). "The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005).

Trial courts must be particularly cautious about granting summary judgment in the employment discrimination context. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citations omitted). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 596, 603 (2d Cir. 2006). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Courts are not to "treat discrimination differently from other ultimate questions of fact." *Id.* However, they still must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 "forbids employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" *Richardson v. Comm'n on Human Rights and Opportunities*, 532 F.3d 114, 119 (2d Cir. 2008) (*quoting* 42 U.S.C. § 2000e-2(a)(1)). Clemente's complaint, which she filed *pro se* and which the Court therefore construes broadly,[3] asserts three types of Title VII claims: claims for race and

---

[3] *Dixon v. Zenk*, No. 08-3510-cv, 2010 WL 227653, at *2 (2d Cir. Jan. 19, 2010) ("When a plaintiff is proceeding *pro se*, a court will broadly construe his motion papers and interpret them to raise the strongest arguments that they suggest."). Clemente filed the Complaint *pro se* but subsequently obtained counsel who assisted her in opposing the instant motion.

gender discrimination, claims for retaliation against protected conduct, and claims for a hostile work environment.  In support of these claims, the Complaint (again, read broadly) alleges four categories of wrongful conduct by the Division: (1) the absconders assignment; (2) dissemination of the anonymous letter; (3) the transfer to the Bronx; and (4) "humiliating and embarrassing" comments by Burgos during the August 25, 2006 meeting.[4]  Clemente asserts that the Division engaged in all four types of conduct in retaliation for her prior Title VII suit, and also to discriminate against her as a Hispanic female.  The pleadings and opposition papers do not straightforwardly link specific allegations to specific claims, so the Court will consider all four categories of conduct in its analysis of all three claims.

I.      **Applicable Law**

        Title VII claims for discrimination, retaliation, and hostile work environment each have different sets of elements.  To establish a prima facie case of race or gender discrimination, a claimant must demonstrate that (1) she belongs to a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.  *See e.g. Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  A *prima facie* retaliation case requires a showing that (1) the employee engaged in protected participation or opposition under

---

[4] Defendant argues that the allegations concerning the August 25, 2006 meeting with Burgos are unexhausted because they were not included in Clemente's charge to the EEOC.  Exhaustion of administrative remedies is a precondition of a Title VII suit.  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001).  However, a plaintiff may raise for the first time in district court claims that are "reasonably related" to allegations contained in a prior EEOC charge.  *Id.*  Because Clemente's EEOC charge alleged that Burgos made inappropriate threats at other labor relations meetings, the allegations about his comments at the August 25, 2006 meeting are "reasonably related" to the EEOC charge.  *See id.* ("A claim raised for the first time in the district court is reasonably related to allegations in an EEOC charge where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.") (internal quotations omitted).  In any case, because the Court finds that plaintiff has not established a *prime facie* Title VII case even when the new allegations are considered, resolution of this issue does not affect the disposition of defendant's summary judgment motion.

Title VII, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action. *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001). Finally, a *prima facie* hostile work environment claim requires plaintiff to demonstrate (1) that her workplace was "permeated with discriminatory intimidation" so severe or pervasive as to alter the conditions of her work environment; and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

Though they have distinct elements, discrimination, retaliation, and hostile work environment claims share certain prerequisites. Most importantly, each requires a showing that the employer's allegedly wrongful conduct derived from a specifically prohibited factor—namely, "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Claims for discrimination and hostile work environment will only survive summary judgment if evidence supports an inference that the employer's conduct was based on one of these factors. *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004); *Pearson v. Board of Education*, 499 F. Supp. 2d 575, 592 (S.D.N.Y. 2007) ("Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII."). Similarly, a retaliation claim requires a showing that the employer took adverse action against the claimant specifically because the claimant opposed discrimination due to race, gender, or another prohibited factor. *See Gourdine v. Cabrini Med. Ctr.,* 307 F.Supp.2d 587, 598 (S.D.N.Y.2004), *aff'd in part and vac'd in part and remanded on other grounds,* 128 Fed. Appx. 790 (2d Cir.2005) ("[I]n order for an employee's complaints to be a 'protected activity,' they must relate to alleged violation of Title VII,

i.e., the complaints must relate to race or gender.")  Employer discrimination, hostility, and retaliation based on other, non-enumerated factors, including union membership, will not support a claim under Title VII.  *See Pearson*, 499 F. Supp. 2d at 592; *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 377 n.8 (S.D.N.Y. 2007) ("[U]nion employees . . . are not a protected class under Title VII."); *Kindle v. Waukegan Community Unit School Dist. 60*, No. 07 C 4643, 2009 WL 4043384, at *4 (N.D. Ill. Nov. 19, 2009) ("[N]on-membership in a union is not a protected class under Title VII . . . .").[5]

In addition, all three types of Title VII claims require a showing that the employer's wrongful conduct reached a certain threshold of severity.   For discrimination and retaliation claims, a plaintiff must present evidence of an "adverse employment action." *See Weinstock*, 224 F.3d at 42 (discrimination); Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 205-06 (2d Cir. 2006) (retaliation).  In the discrimination context, an adverse employment action is a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience."  *Galabya v. New York City Board of Ed.*, 202 F.3d 636 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 126 (7th Cir. 1993)). For retaliation claims, an employment action is "materially adverse" if it is "harmful to the point that that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *See Hicks v. Baines*, -- F.3d --, 2010 WL 346710, at *4 (2d Cir. Feb. 02, 2010) (*quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  In the same vein, to establish a *prima facie* case of hostile work environment, a

---

[5] Clemente appears to be pursuing a separate administrative action under New York's Public Employees Fair Employment Act for discrimination based on her union membership and activity. *See* N.Y. Civ. Serv. Law § 209-a(2) (commonly known as the "Taylor Law"); Compl. at 2.  Neither party mentions this separate action in their summary judgment submissions.

plaintiff must show that the alleged conduct was sufficiently "severe" or "pervasive" to create "an environment that would reasonably be perceived, and is perceived, as hostile or abusive." *Schwapp*, 118 F.3d at 110 (internal quotations omitted). Thus, regardless of which type Title VII claim a plaintiff asserts, she must show that employer conduct based on a prohibited factor was more than an isolated or minor incident. *See id.*

Title VII claims are generally analyzed using the three step burden-shifting approach first laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). Now a well known and established procedure for analyzing discrimination, retaliation, and hostile work environment claims, the *McDonnell Douglas* test is applied as follows. First, the plaintiff bears the initial burden of establishing a *prima facie* case. *Id.*; *Williams v. R. H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). If the plaintiff satisfies this burden, the employer is rebutably presumed to have violated Title VII. The burden then shifts to the employer, who must provide a legitimate, nondiscriminatory business rationale to justify its conduct. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer provides such a rationale, the presumption created by the *prima facie* case "drops out." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001). To defeat summary judgment, the plaintiff must then present admissible evidence of "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry*, 336 F.3d at 139 (*quoting Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

## II.     Application

In this case, plaintiff has not met her *prima facie* burden to show that any of the Division's conduct toward her was based on her race or gender.  Though evidence of anti-union animus permeates the record, nothing suggests that plaintiff was treated differently because she is a *woman* or because she is *Hispanic*, or because she complained of discrimination based on those factors.  A plaintiff may appropriately rely upon a range of evidence to support an inference that employer conduct was tied to race or gender.  *See Leibowitz v. Cornell University*, 584 F.3d 487, 502 (2d Cir. 2009) ("[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.").  But plaintiff does not draw upon any such evidence.  With respect to the absconder assignment, plaintiff's own theory is that she was given the work because she was a union leader.  (Compl. at 2 ("On 7/8/05 and 7/12/05 we the officers of the NYS Division of Parole held rallies in Albany.  As retaliation to the rallies, not only was I assigned to a desk assignment for two weeks, but this assignment was Out of Title duty . . . .").)  Nothing indicates that race or gender, or plaintiff's prior lawsuit complaining of race and gender discrimination, factored into the assignment.[6]  Similarly, with regard to the anonymous letter, the letter itself lays bare

---

[6] Plaintiff's retaliation claims are particularly weak.  Other than the bare chronology of events, nothing in the record links the prior suit to any of the conduct of which she complains.  Clemente brought the prior suit in 2001, received an unfavorable judgment in August 2004, and began experiencing alleged discrimination in July 2005.  The 11-month gap between the judgment and the alleged retaliatory conduct is too long to support, on its own, an inference of causal connection.  *See Miller v. Kempthorne*, No. 08-2466-CV, 2009 WL 4893670, at *2 (2d Cir. Dec. 21, 2009) ("the one-year time frame here falls well beyond that contemplated by this Court as giving rise to . . . an inference [of causal connection].") (*citing Hollander v.*

that ongoing tensions with the union (as opposed to race or gender animus, or retaliation for plaintiff's lawsuit) motivated Division management to disseminate it.  The letter is about the *union*.  (Karlin Decl. Ex. B ("[W]e are tired of the way our union protects people who are not doing the job.").)  It criticizes four union leaders: Clemente, another female PO, and two male POs.  (*Id.*)  Plaintiff does not offer evidence about the other three leaders' race; nor does other record evidence show that race or gender, or the prior lawsuit, somehow contributed to management's decision to send the letter to the media and to the Division's regional directors.

Plaintiff similarly fails to make out a *prima facie* case with respect to her transfer to the Bronx.  The claim that the transfer was tied to Clemente's race, gender, or prior lawsuit suffers an initial sheen of implausibility because the move affected an entire unit of POs, not just plaintiff.  *See Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 140-41 (E.D.N.Y. 2002) (affirmative evidence of lack of disparate treatment undermines inference of prohibited discrimination).  Moreover, as with the absconder assignment, plaintiff herself has opined that the Division imposed the transfer in retaliation for her union activity.  (Knudsen Decl. Ex. B at 5 ("These are Union-busting techniques.").)  The record also includes a letter from another union official, Marvin Moschel, that supports the union-busting theory.  (Karlin Decl. Ex. E at 1-2.)  Mr. Moschel asserted that Burgos, the human resources director, had Clemente transferred for reasons related to union politics.  (*Id.* at 2 ("Mr. Burgos threatened, during several Labor Management meetings .

---

*Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990), for the proposition that a "three-and-a-half-month lapse between complaint and adverse action" alone does suffice to establish a *prima facie* retaliation case). Moreover, because a court's issuance of a judgment does not constitute "protected activity," the actual gap between Clemente's protected conduct and the alleged retaliation is far wider than 11 months.  The protected activity element requires that the *employee* engage in "protected participation or opposition." *Cifra*, 252 F.3d at 216.  The only protected conduct Clemente identifies is the complaint she filed in 2001, four years before the alleged misconduct began.  This chronology does not come close to establishing a *prima facie* case of causal nexus.  *See Miller*, 2009 WL 4893670 at *2.

. . to remove Ms. Clemente from her Manhattan location away from her constituency as PEF Council Leader and steward.").)  Admittedly, at the end of his letter, Mr. Moschel did speculate that Burgos's inability to "tolerate a Hispanic woman being as dynamic and charismatic a leader as Ms. Clemente is" contributed to his desire to transfer her, but the letter does not support this statement with any facts.  (*Id.*)  Thus, Mr. Moschel's assertion that gender animus contributed to the transfer, standing against the facts recited in his letter showing only anti-union animus, is conclusory and inadequate to support a *prima facie* case that the transfer resulted from prohibited discrimination.  *See McLaughlin v. New York City Bd. of Educ.*, No. 04 Civ. 1270 (FM), 2008 WL 216308, at *12 (S.D.N.Y. Jan 22, 2008) (conclusory allegations do not establish *prima facie* Title VII case); *Sampson v. City of New York*, 2009 WL 3364218, at *5 (S.D.N.Y. Oct. 19, 2009) ("[C]onclusory allegations of age discrimination fail to give rise to the inference of discrimination required to state a prima facie case . . . .").

Even if Clemente had established a *prima facie* case with respect to the transfer, summary judgment would still be appropriate.  The Division has offered a legitimate business explanation by articulating two related rationales for the transfer: to realize organizational efficiencies by combining the Manhattan and Bronx units of the region's Warrant Squad, and to relieve overcrowding in the Manhattan office.  (Knudsen Decl. Ex. B at 7-8; Ex. E at 30:2-17.)  That the decision affected the entire Manhattan Warrant Squad, and not just Clemente, corroborates the legitimacy of this explanation.  (Pl. 56.1 ¶ 8.)  The only contrary evidence that Clemente offers comes in her own declaration, via statements that are unsupported by other sources.  (Clemente Decl. ¶ 7 ("There was an abundance of space in the Manhattan office . . . . In the Bronx office, there is no

accessibility to [other agencies'] computers.  Thus, it has been difficult to complete [the unit's work] . . . . In short, the transfer made absolutely no sense . . . .").)   Because it stands only on Clemente's own statements, this is not a strong rebuttal of the Division's explanation.  However, even if this evidence is sufficient to raise a genuine issue of fact as to whether the Division's explanation is pretextual, Clemente's case still fails because the record as a whole does not support a reasonable inference that the explanation was a pretext for *race or gender discrimination*.  *Terry*, 336 F.3d at 139; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) ("[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").  Simply rebutting the Division's explanation of the transfer does not absolve Clemente of her obligation to present sufficient evidence to permit a rational finder of fact to infer that the defendant's employment decision was "more likely than not" based on a prohibited factor.  *See James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) ("[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given . . . the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred.").  Aside from the unsupported conclusion in Moschel's letter, nothing in the record links Clemente's race, gender, or prior lawsuit to the transfer.  Indeed, the transfer decision affected a group of five Division employees, and no evidence indicates that they shared a common race, gender, or history of protected activity.  And to the extent pernicious motives were at work, Clemente's own statements suggest they were union-based. (Knudsen Decl. Ex. B at 5 ("I am sure that [the transfer]

is happening because of my position as a Union Council leader.").)  On these facts, the Court holds that no reasonable jury could find it more likely than not that the transfer resulted from prohibited discrimination or retaliation.

Finally, Clemente also fails to establish a *prima facie* claim with respect to her allegations concerning the August 25, 2006 meeting with Burgos.  Notably, this group of allegations includes the only piece of non-conclusory evidence that hints at the significance of race or gender.  Plaintiff and Moschel both declare that Burgos, after "humiliating and embarrassing" plaintiff with non-race or gender related comments at the meeting, explained his conduct by saying "you know how us Black and Hispanic men are."  (Pl. 56.1 ¶ 10; Clemente Decl. ¶ 8; Karlin Decl. Ex. B at 5.)  The comment, however, is ambiguous: because Burgos was referring to his *own* race and gender, whether it implies that *plaintiff's* race and gender motivated him to embarrass her is not immediately apparent.  But in any event, this single comment is not enough to support an inference that Clemente endured a hostile work environment, or suffered some adverse employment action (such as the transfer or the absconders assignment), because she is a Hispanic woman.  *See Schwapp*, 118 F.3d at 110 ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'") (*quoting Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986)); *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 85 (2d Cir. 2001) (An adverse employment action "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . .

unique to a particular situation.") (internal quotation marks omitted).[7]  And even if the
ambiguous comment did satisfy plaintiff's *prima facie* burden with respect to her
discrimination or hostile work environment claims, summary judgment would still be
appropriate in light of the extensive evidence, much of it from plaintiff herself, showing
that the only discrimination she suffered was union-based.  (*E.g.*, Clemente Dep. at 116-
17 ("[T]he hostile environment [began] from the minute I became council leader . . .
everything that was done to me was retaliation, discrimination, based on myself stepping
up, defending the members and speaking towards the media.").)  Regardless of how one
interprets Burgos's "black and hispanic men" comment, no reasonable fact-finder could
find by a preponderance of the evidence that race, gender, or the prior Title VII lawsuit
caused the Division to make any decisions affecting Clemente's employment or to
subject her to a hostile work environment.  Defendant is therefore entitled to summary
judgment.  *See Terry*, 336 F.3d at 139.

Though not borne out by the evidence, the nub of plaintiff's Title VII complaint
appears to be that race and gender discrimination compounded the anti-union animus she
experienced.  Because she is a Hispanic woman, she believes she endured more egregious
discrimination, retaliation, and hostility than a non-minority union leader would have.
The record contains conclusory statements to this effect.  (Clemente Decl. ¶ 4 ("I was the
first and only female Hispanic parole officer to become council leader for the Union . . . .
It cannot be overemphasized that I have never observed a council leader that was

---

[7] Though Burgos's comments from the August 26th meeting did not alter the "terms or conditions" of
Clemente's employment, and therefore cannot constitute an adverse employment action for purposes of a
discrimination claim, the comments come closer to satisfying the "materially adverse" standard that applies
to retaliation claims.  *See Hicks*, 2010 WL 346710 at *4 (actions are "materially adverse" if they "could
well dissuade a reasonable worker" from complaining of protected conduct).  However, given Clemente's
failure to present evidence of a causal nexus between her prior Title VII suit and any of the Division's
conduct, including Burgos's comments, whether those comments were "materially adverse" is irrelevant.
*See id.* at *3 (reciting elements of retaliation claim).

subjected to the type of conduct that I was subjected to and believe that besides retaliation the conduct directed at me was due to being a Hispanic female.").)  That racism or sexism may have exacerbated the ill treatment plaintiff received on account of her union activity is far from an absurd contention, and if supported by the record, it might establish a *prima facie* Title VII case.  *See Terry*, 336 F.3d at 138 (to survive summary judgment, claimant must show that employer's conduct was based "in whole or in part" upon a prohibited factor).  But conclusory allegations will not defeat a motion for summary judgment.  *Schwapp*, 118 F.3d at 110 ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").  Moreover, the conclusory statements in Clemente's declaration are further undermined by her deposition, in which she testified unequivocally that "everything that was done to [her]" stemmed from anti-union animus. (Clemente Dep. at 117:12-16.)  Plaintiff cannot avoid summary judgment by submitting a declaration that contradicts that testimony.  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  Rather, to state a case that she endured more severe anti-union discrimination because of her race and gender, plaintiff must submit viable evidence to that effect—evidence that, to give just one example, union leaders who did not belong to protected classes had materially different experiences.  *See Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07 Civ. 8676 (RJH), 2010 WL 184450, at *8 (S.D.N.Y. Jan. 20, 2010) ("The fourth element of a *prima facie* employment discrimination case can indeed be satisfied by showing that the employer 'treated [the employee] less favorably than a similarly situated employee outside his protected group.'") (*quoting Graham v. LIRR,* 230 F.3d 34, 39 (2000)).  As it is, the evidence on

18

record cuts against the inference that management treated Clemente differently than other union leaders: the anonymous letter of which she complains criticized four such leaders, male and female, not just Clemente. (Karlin Decl. Ex. B.) Because she has not submitted sufficient countervailing evidence, and in light of her own deposition testimony, summary judgment is appropriate.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court is requested to enter a judgment in favor of defendant and to close this case.

SO ORDERED.

Dated: New York, New York
February 9, 2010

Richard J. Holwell
United States District Judge

19